IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**BARBARA J. GALLEGOS,**

      **Plaintiff,**

**vs.**                                                                            **No.  01cv0874 DJS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Gallegos's) Motion to Reverse and Remand for a Rehearing **[Doc. No. 9 ]**, filed April 26, 2002.  The Commissioner of Social Security issued a final decision denying Gallegos's application for supplemental security income.  Having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, the Court finds that the motion to reverse and remand is not well taken and will be DENIED.

## I.  Background

Gallegos, now thirty-nine years old, filed her application for supplemental security income on October 26, 1999, alleging disability since November 1, 1998, due to right ankle nerve damage, right leg problems, and pain. Gallegos has a ninth grade education and completed vocational training as a nail technician.  Her past relevant work was as a nail technician.  Her claim was denied initially and on reconsideration.  On November 30, 2000, the Commissioner's Administrative Law Judge (ALJ) denied benefits, finding that Gallegos's impairments, which

consisted of "right ankle talonavicular nonunion; foraminal compression at L5 in her lumbar spine, which caused right sciatica; depression; and substance abuse disorder," were severe but did not singly or in combination meet or equal in severity any of the disorders described in the Listing of Impairments, Subpart P, Appendix 1.  Tr. 17.

The ALJ further found Gallegos retained the residual functional capacity (RFC) to perform light and sedentary jobs limited to walking and/or standing no more than one hour during an eight hour day.  Tr. 21.  In addition, the ALJ found Gallegos was further limited by her nonexertional limitations, which precluded her from performing any job that required more than occasional climbing, balancing, crawling, or crouching.  Finally, the ALJ found Gallegos also was limited by her mental impairments to simple, repetitive work.  *Id.*  As to her credibility, the ALJ found Gallegos' "allegations regarding her limitations are not credible and cannot be relied upon to determine the intensity, frequency, or persistence of her subjective symptoms or the extent of her limitations."  *Id.*  Gallegos filed a Request for Review of the decision by the Appeals Council.  On June 14, 2001, the Appeals Council denied Gallegos's request for review of the ALJ's decision.  Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes.  Gallegos seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether she applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Gallegos makes the following arguments: (1) the ALJ's improperly determined her RFC; and (2) the ALJ's finding that her complaints of pain were not credible is contrary to the evidence and the law. The Court will address Gallegos' second argument first.

## A.  Credibility Determination

Credibility determinations are peculiarly the province of the finder of fact and will not be upset when supported by substantial evidence. *Diaz v. Secretary of Health and Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen,* 838 F.2d 1125, 1133 (10th Cir. 1988). However, the ALJ's credibility determination does not require a formalistic factor-by-factor recitation of the evidence. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ need only set forth the specific evidence he relies on

in evaluating claimant's credibility.  *Id.*  The ALJ also may consider his personal observations of the claimant in his overall evaluation of the claimant's credibility.  *Id.*

In evaluating a claimant's credibility regarding pain, the ALJ must consider the level of medication the claimant uses and its effectiveness, the claimant's attempts to obtain relief, the frequency of medical contacts, the claimant's daily activities, subjective measures of the claimant's credibility, "and the consistency or compatibility of nonmedical testimony with objective medical evidence."  *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995) (quotation omitted).  The inability to work pain-free is not sufficient reason to find a claimant disabled.  *See Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

In evaluating the severity of Gallegos' right ankle and lower back pain, the ALJ applied the *Luna* factors.  *See Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987).  Pursuant to *Luna*, the ALJ considered (1) whether there was objective medical evidence of a pain producing impairment, (2) whether there was a loose nexus between this objective evidence and Gallegos' complaints of pain, and (3) whether, in light of all the evidence, both objective and subjective, the pain was in fact disabling.  *Id.* at 163-166; Tr. 13, 14.  The ALJ also considered the *Kepler* factors.  Tr. 14.

The ALJ found that the medical record established impairments that could be considered reasonably related to Gallegos' complaints of pain in her right ankle, lower back, and right leg. Tr. 14.  Recognizing that disability under the regulations required more than an inability to work without pain, but rather, required pain so severe as to preclude any substantial gainful employment, the ALJ found Gallegos did not meet this standard.  In his decision, the ALJ found that Gallegos "exaggerate[d] the intensity and persistence of her pain" and opined that "her statements of record [could] not be relied upon to support a finding that she [could] not perform

any work because of pain." Tr. 14. The ALJ also considered Gallegos' behavior at the administrative hearing, stating, "Throughout the entire hearing, Claimant's facial expressions, often grimaces, and her movements up and down were clearly intended to suggest that she was in constant acute pain." Tr. 18.

The ALJ also considered Gallegos' testimony as to her need for a cane. Tr. 15. At the Administrative hearing, the ALJ questioned Gallegos about her use of a cane. Tr. 47. Gallegos told the ALJ she had a cane, walker, and crutches. According to Gallegos, she used these at the suggestion of the physicians at UNM Health Services Center (University Hospital). The ALJ reviewed the record and found no evidence that Gallegos had an ongoing need of any assistive device and, in fact, had reported in her February 8, 2000 Daily Activities Questionnaire (Tr. 109) that she continued to use these assistive devices on her own advice. Tr. 15.

And, although Gallegos' abuse of crack cocaine, cocaine and alcohol, as well as an addiction to opiate medication, are well documented in the record (Tr. 218-293), she testified at the administrative hearing that she had **never** used cocaine, crack, narcotics, or marijuana. Tr. 38. Gallegos also testified she had stopped drinking eight months prior to the hearing. The ALJ found this testimony significant in assessing Gallegos' credibility as to the severity of her pain. The record indicates the following:

On December 30, 1998, a counselor completed a Mental Health Assessment on Gallegos. Tr. 231-233. At that time, Gallegos reported having an ongoing crack and cocaine problem. Tr. 231. Gallegos reported abusing crack and cocaine during 1996 and 1997, with relapses every five months. *Id.* She claimed she had been clean for six months and was "trying so hard to stay off drugs." *Id.*. Gallegos also reported she was unable to work because of depressive symptoms. Tr.

234. Under "Medical/Health History," Gallegos reported having surgery on her ankle but did not complain of pain. Tr. 231.

In December, 1999, a counselor that had worked with Gallegos for a year transferred her to a counselor "with training and education" specific to her problems because of her history of substance abuse, "reportedly in sustained remission." Tr. 260, 262, 266. Gallegos had expressed a desire to get off Percocet and Vicodin (narcotic analgesic agents). Tr. 263. Recognizing that Gallegos could be addicted to pain medication, he referred her to **Victor Arrey, a licensed alcohol and drug abuse counselor**. Gallegos also had reported "increased physical pain because of her ankle" but told the counselor that "[h]er doctor allegedly will not prescribe narcotic pain medication for her because of her history as a drug user." Tr. 266.

However, contrary to her statement to the counselor, Gallegos had continued to receive narcotic pain medication. On December 23, 1999, Gallegos went to First Choice for a prescription refill. Tr. 325. She reported she was taking Percocet every 4-6 hours and claimed it controlled her pain. Gallegos informed the health care provider she was seeing Dr. Miller and Dr. Brown at University Hospital. She left First Choice with a prescription for Percocet. *Id.* Gallegos also called First Choice on December 27, 1999, requesting a prescription refill. Tr. 324. The record indicates her last Percocet refill had been on December 14, 1999. At that time, Gallegos had received 180 Percocet. The health care provider questioned why she only had six left, Gallegos claimed her "boyfriend stole 100 of her Percocet." *Id.*

On January 12, 2000, Victor Arrey, completed an Addiction Severity Index. Tr. 230. At that time, Gallegos admitted to "a recent three year cocaine and a one year alcohol abuse that may be continuing presently." *Id.* Gallegos also admitted to a three year period in which she

frequently used prescribed opiate medication for pain.  The counselor opined that the evaluation indicated Gallegos "may be misrepresenting on information she provided regarding other substance use." *Id.*  Significantly, the counselor noted Gallegos "had been in treatment for substance abuse that included detoxification in the past." *Id.*  The counselor diagnosed her as opioid dependent and opined that substance abuse was contributing to her emotional and psychological problems.  *Id.*  The counselor also concluded that Gallegos had a high potential to relapse or continue abusing drugs and alcohol.  At that time, Gallegos maintained that she did not need treatment and was only in counseling because it was court mandated.

On February 2, 2000, Gallegos went to University Hospital's emergency room complaining of withdrawal symptoms.  Tr.181.  She reported she had been fighting withdrawal for two years **by increasing her narcotic intake**.  *Id.*  Gallegos had been to the Pain Management Clinic at University Hospital and received MS Contin[1] for her ankle pain and only had one left.  Because she was getting married the following Friday, she did not want to be in withdrawal.  *Id.*  The emergency room health care provider called Dr. Zuniga, the physician who had evaluated Gallegos at the pain clinic and prescribed MS Contin.  Dr. Zuniga advised Gallegos not to go to CASAA (a center that provides substance abuse treatment) because **"it was not an addiction**." *Id.* (emphasis added).  It is apparent that Gallegos had not advised Dr. Zuniga that she had a substance abuse problem, and he regarded it as a tolerance to her narcotic pain medications.  The ALJ cited to this evidence finding that although Gallegos had made statements

---

[1] MS Contin is a controlled-release tablet containing morphine sulfate.  MS Contin 200 mg Tablets are used only for opioid **tolerant** patients.  *Physicians' Desk Reference* 2556 (53rd ed. 1999).

"to the effect that she must take large quantities of prescription narcotics to control her pain, . . . the record suggests that she has, in fact, been abusing these drugs for the past three or four years." Tr. 17.

On February 8, 2000, Gallegos saw Mr. Arrey and reported "being off drugs and taking only non-narcotic medication for her pain, prn (as needed)." Tr. 251. She reported being addicted to opiates for four years. She also reported she was now receiving alternative treatment at the Pain Management Clinic. *Id.*

On February 15, 2000, Mr. Arrey reported Gallegos "appeared to be happy and very open about her past problems related to drugs– she stated she neglected many things in life to abuse drugs. She admitted that she could not focus before and that since she's been off drugs, she is beginning to clear her mind and 'becoming aware of life.'" Tr. 249.

The record indicates that Gallegos started counseling in late 1998 and continued until at least early 2000. There are no notations by any counselor or therapist indicating Gallegos was in such severe pain that she could not sit through an individual or group session due to right ankle or lower back pain. Gallegos was receiving individual sessions biweekly and group sessions weekly. Tr. 237. The sessions were for one hour. *Id.*

The ALJ cited extensively to the record and set forth the specific evidence he relied on in evaluating Gallegos' credibility. Therefore, the Court finds that the ALJ's credibility determination is supported by substantial evidence and will not be disturbed.

## B.   RFC Determination

In this case, the ALJ determined Gallegos was not disabled at step five of the sequential evaluation process. The ALJ reviewed the RFCs submitted by the state agency medical experts

9

and agreed with their findings, however, based on Gallegos' claim that her mental impairments affected her ability to concentrate, he found she was limited to simple, repetitive work. Tr. 19. The ALJ also considered the medical and psychological experts of record. Tr. 18. Based on the record, the ALJ found Gallegos could perform light and sedentary work, but she could not walk and/or stand for more than one hour during an eight hour day and could not operate foot controls with her right foot. Tr. 19, 21. The ALJ also found Gallegos was "further limited by her nonexertional limitations, which preclud[ed] her from performing any job that require[d] more than occasional climbing, balancing, crawling, or crouching." Tr. 21. Because the ALJ found Gallegos could not return to her past relevant work and there was evidence of nonexertional impairments, he did not rely on the medical-vocational guidelines conclusively. Instead, the ALJ called a VE to testify to the erosion of the occupational base. Relying on the VE's testimony, the ALJ determined there were a significant number of jobs in the national economy that she could perform and thus she was not disabled. Tr. 21.

Gallegos contends the ALJ made the following errors at step five of the sequential evaluation process: (1) he did not carry his burden of coming forward with evidence that she could perform the functional requirements of light work; (2) he failed to consider the opinion of the treating orthopedist; and (3) he made an erroneous credibility determination. The Court has already addressed the ALJ's credibility determination.

Gallegos contends that, at step five, the burden shifts to the Commissioner to show that the claimant retains the RFC to perform a significant number of jobs in the economy. Pl.'s Mem. in Supp. of Mot. to Reverse and Remand at 3. According to Gallegos, that burden of proof

includes the obligation to establish the RFC with substantial evidence and the obligation to show that the nonexertional impairments do not significantly reduce the RFC. *Id.*

At step five, the Commissioner bears the burden of proving by substantial evidence that the claimant retains the RFC to perform work at some level lower than his/her past relevant work. *Thompson,* 987 F.2d at 1491. The claimant bears the burden of proof at steps one through four. *See Nielsen v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993). The claimant's RFC is **determined once**, in detail, at step four.[2] *See* 20 C.F.R. § 404.920(e); SSR 96-9p, 1996 WL 374185, at *2, *5-*9; SSR 96-8p, 1996WL 374184, at *5-*7; SSR 86-8, 1986 WL 68636, at *4; *see also Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). If the evaluation of the claim proceeds to step five, the same RFC finding is considered along with other factors to determine whether the claimant can perform work other than his or her past relevant work. *See* 20 C.F.R. § 416.920(f); SSR 86-8, 1986 WL 68636, at *7. The ALJ correctly applied the agency's sequential evaluation process.

Gallegos also claims the ALJ's RFC finding is not clear and is not supported by substantial evidence. Gallegos argues that the ALJ found she could only **walk and/or sit** for a maximum of one hour at a time. Tr. 19. However, the ALJ also found Gallegos "was limited to **walking and/or standing** no more than one hour during an eight hour day." Tr. 21. Additionally, the ALJ's hypothetical to the vocational expert (VE) included the following:

---

[2] In order to make the ultimate finding that a claimant is not disabled at step four, the ALJ is required by the agency's rulings to make specific and detailed predicate findings concerning the claimant's residual functional capacity, the physical and mental demands of the claimant's past jobs, and how these demands mesh with the claimant's particular exertional and nonexertional limitations. *See* SSR 96-8p, 1996 WL 374184, SSR 82-62, at *4; *see also*, *Winfrey,* 92 F.3d at 1023-25.

> I want you to assume that she can lift 20 pounds occasionally, 10 pounds frequently, and **stand or walk one hour** in, in an eight hour day, but she does not have prolonged walking or standing. She can sit up to eight hours in an eight hour day. She has limited push/pull with her right leg and she can occasionally climb, balance, crawl, crouch, and kneel. She's limited to simple repetitive work. Based upon that hypothetical, is there work available in the regional and national economies in substantial numbers that such a person could do?

Tr. 55. Gallegos complains that the ALJ failed to mention a sitting restriction in his second finding. However, the ALJ made clear in his hypothetical that Gallegos could sit up to eight hours in an eight hour day. Additionally, at the administrative hearing, the ALJ questioned the VE regarding the VE's testimony that Gallegos could perform the job of cashier. The following exchange took place in response to the ALJ's hypothetical:

A. Yes, your Honor, I believe from that hypothetical, I think she could do the nail tech, the easiest job I would—

Q. Would, she could do that as commonly performed?

A. As it is performed, as she did it, yes, your Honor.

Q. Would you give me three or four options?

A. Okay, I would say a cashier, unskilled, light job, that DOT is 211.462-010. There's–

Q. She can do that with a maximum standing, stand of one hour a day?

A. No, sorry.

Q. Okay.

A. That's I messed up.

Q. Okay, maximum standing of an hour, no prolonged standing.

Tr. 55. It is clear to the Court that the ALJ found Gallegos could only stand for a maximum of one hour and that the reference to "walk and/or **sit** for more than an hour at a time" was simply

12

an error.  Minimal error by the ALJ does not require reversal or remand.  *See Diaz*, 898 F.2d 774, at 777.

Gallegos next contends that the information provided by the ALJ in his hypothetical to the VE is not supported by the evidence.  Gallegos argues that the ALJ based his RFC finding on the opinions of the State agency, non-examining physicians and those opinions are contradicted by the evidence.

Pursuant to Social Security Ruling 96-6p, findings regarding the nature and severity of an impairment made by state agency consultants and other program physicians and psychologists "must be treated as expert opinion evidence of nonexamining sources."  SSR 96-8p, 1996 WL 374180, at *1.  Moreover, an ALJ "may not ignore these opinions and must explain the weight given to this opinions in their decisions."  *Id.*

In his decision, the ALJ gave careful consideration to the opinions expressed by State agency medical experts.  Tr. 18.  The agency medical experts reviewed Gallegos' medical records and completed RFC forms on November 12, 1999 and on April 3, 2000.  Tr. 202-217.  Dr. Donald B. Stewart completed an RFC form on April 3, 2000, and found Gallegos was able to stand and/or walk for a total of at least two hours in an eight-hour workday, and opined she could not perform a full range of light work.  Tr. 211, 216.  He believed this could be temporary.  *Id.* Dr. Stewart also concluded Gallegos could sit for six hours in a eight-hour workday.  Tr. 211.

Gallegos contends "the opinions of these doctors (Drs. Stewart and Golish) are substantial evidence only if they are uncontradicted, and in this case they are not."  However, Gallegos failed to cite the evidence that contradicts their opinions.

In addition, Gallegos contends the ALJ should have given controlling weight to her treating physician's opinion that she was disabled. Gallegos contends her treating physician, Dr. Richard A. Miller, submitted a letter stating she was disabled and unable to work at a sedentary job due to her medical conditions. *See* Tr. 328. On October 3, 2000, Dr. Miller wrote a short letter to Gallegos' counsel, stating Gallegos was disabled, unable to work at a sedentary job due to her medical conditions, and was entitled to Social Security Disability Benefits. *Id.* On November 14, 2000, Dr. Miller wrote a second letter to Gallegos' counsel, stating "Mrs. Gallegos has some major problems which have kept her from being able to work." Tr. 342. According to Dr. Miller, Gallegos "was evaluated by a pain clinic, which noted a significant problem with the [Gallegos'] back, and she does have trouble sitting for prolonged periods because of back pain." *Id.*

Generally, the ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). A treating physician's opinion is considered in relation to factors such as its consistency with other evidence, the length and nature of the treatment relationship, the frequency of examination, and the extent to which the opinion is supported by objective medical evidence. 20 C.F.R. § 404.1527(d) (1)-(6). If the physician's opinion is "brief, conclusory and unsupported by medical evidence," that opinion may be rejected. *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988). Moreover, a treating physician's opinion that a claimant is totally disabled is not dispositive "because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]." *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994).

Dr. Miller's October 3, 2000 letter is short and conclusory.  However, Dr. Miller's November 14, 2000 letter is more informative.  According to Dr. Miller, Gallegos "was evaluated by a pain clinic, which noted a significant problem with the patient's back, and she does have trouble sitting for prolonged periods because of pain."  Tr. 342.  Dr. Miller also stated Gallegos had "in the past required narcotic pain medication for a prolonged period of time because of pain in the foot and because of pain and difficulties with her back."  *Id.*  Dr. Miller opined Gallegos would have "some persistent limitations with regards to her foot and the length of time that she [would] be able to stand and walk on it . . . ."  *Id.*  Dr. Miller stated Gallegos had "major problems which kept her from being able to work."  *Id.*

The ALJ discussed Dr. Miller's medical reports throughout his decision.  The ALJ also cited to Dr. Allison A. Richards' February 10, 2000 medical notes.  Tr. 179.  Dr. Richards is an orthopedist at University Hospital Department of Orthopaedics & Rehabilitation.  *Id.*  Dr. Richards evaluated Gallegos for "a long history of low back pain."  *Id.*  Dr. Allison's medical notes indicate the following:

> **HISTORY**:  The patient is a 36 year old woman, who has a long history of low back pain.  She is being seen by Dr. Zuniga of the Pain Clinic, and apparently has been given an epidural injection, which makes it tolerable.  She is being seen today for possible spondylosis.  She denies any bowel or bladder dysfunction, and does note occasional pain traveling down her right leg.
>
> **PHYSICAL EXAM**:  The patient walks with a normal heel/toe gait.  She is able to toe and heel walk.  Strength is 5/5 bilaterally for iliopsoas, quadriceps, hamstrings, tibialis anterior, gastrosoleus, and extensor hallucis longus.  There is a 2+ patellar tendon reflexes, with no clonus on ankle exam.  Sensation is intact.  There is 2+ dorsalis pedis and posterior tibialis pulses.  She has negative straight let raises bilaterally.  They both cause low back pain, but no radiation of symptoms below the knee.  There is tenderness in her lumbar region and in her sacroiliac region.
>
> **X-RAYS:** x-rays today show a pars defect at L5-S1.  There is no motion on flexion/extension films.  She has excellent alignment, with no evidence of slip.

>**IMPRESSION:** L5-S1 spondylosis[3].
>
>**PLAN**: The plan is for her to continue being seen by the Pain Clinic for pain control. Her epidural appears to be working relatively well. We have also given her a prescription for Physical Therapy to work on abdominal muscle strengthening. We would like to see her back in Dr. Crawford's clinic in two months. No new x-rays are necessary unless she is having further difficulties. The patient was discussed with Dr. Crawford.

Tr. 179. Gallegos' physical examination was relatively unremarkable and her x-rays indicated excellent alignment, with no evidence of slip. Dr. Richards opined her pain management was working well. Significantly, Gallegos did not complain about having any problems sitting for prolonged periods of time.

On January 1, 2000, Dr. William L. Johnson evaluated Gallegos for possible reflex sympathetic dystrophy.[4] Tr. 188. It was Dr. William's assessment that Gallegos did not have reflex sympathetic dystrophy. *Id.* Dr. Williams described Gallegos as "36 year old female in no acute distress" and diagnosed her problem as "structural pain." *Id.* His physical examination revealed no autonomic or sympathetic changes, no mottling, and "one very tender spot on the anterior on the dorsum of the right foot." *Id.* Dr. Williams prescribed MS Contin for pain relief and referred her back to Dr. Miller.

On September 15, 2000, Dr. Richard Miller reported he was no longer concerned about Gallegos suffering from reflex sympathetic dystrophy. He noted her pain was "quite localized"

---

[3] Spondylosis is degeneration or deficient development of the articulating part of a vertebra. *Stedman's Medical Dictionary* 1656 (26th ed. 1995).

[4] Reflex sympathetic dystrophy is a chronic pain state induced by soft tissue or bone injury in which pain is associated with autonomic changes (e.g., sweating or vasomotor abnormalities) and/or trophic changes (e.g., skin or bone atrophy, hair loss, joint contractures). *The Merck Manual* 1372-73 (17th ed. 1999).

and her pain medication helped her and let her walk without any assisted devices. Tr. 294. Dr. Miller did not mention anything regarding Gallegos' back problem.

The Court has carefully reviewed the record and although there is some evidence which may tend to establish Gallegos' disability, the determinative conclusion is that there is also substantial evidence to support the ALJ's finding of no disability.  Tr. 305 (May 29, 2000– "doing much better, feels her meds are helping more;" "sleeping about 10 hrs/day not problematic;" "no pain on leg extension, improved since last month;" "feels much better, not depressed;" "return in one month, continue current meds"); Tr. 306 (May 29, 2000– "feeling better with start of adjustment of meds"); Tr. 310 (meds cut [back] pain from 8-10/10 to 2-3/10); Tr. 318 (epidural helped; pain level down to 4/10).   It is the province of the Commissioner to resolve conflicting evidence.  And, it is not the Court's role to reweigh the evidence or to substitute its judgment for that of the Commissioner.  *See Hargis v. Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991).  On this record, the Court sees no reason to overturn the Commissioner's conclusion that, although Gallegos experienced pain, it was not so severe as to be disabling,  and thus she could do a limited range of light work and a full range of sedentary work.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**